IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMIE K. DINS,

                  Plaintiff,

  v.                                                     OPINION and ORDER

STATE OF WISCONSIN DEPARTMENT OF              24-cv-411-jdp
NATURAL RESOURCES,

                  Defendant.

---

Plaintiff Jamie Dins was a conservation warden for defendant Wisconsin Department of Natural Resources. Dins alleges that, during her time with DNR, a male coworker made sexist comments to her and her female colleagues. Dins reported these incidents, and she says she was forced to resign because of them. She also alleges that a human resources representative interrogated her about her intimate relationship with a female colleague.

Dins filed this suit against DNR, contending that it is liable for a hostile work environment, constructive discharge, discrimination, and retaliation under Title VII of the Civil Rights Act of 1964. DNR moves for summary judgment. Dkt. 17.

The court will grant DNR's motion for summary judgment and close this case. Dins's hostile work environment claim fails because no reasonable jury could find that the conduct was severe or pervasive. Her constructive discharge claim fails because she did not adduce evidence from which a reasonable jury could find that her working conditions had become objectively intolerable. Finally, her discrimination and retaliation claims fail because the undisputed facts show that DNR had a legitimate, non-discriminatory reason for taking adverse employment actions against Dins, and Dins provided no evidence that DNR's reason was a lie.

PRELIMINARY EVIDENTIARY ISSUES

Before considering the merits of the DNR's summary judgment motion, the court addresses two preliminary issues that affect the evidence that the court will consider: DNR's contention that Dins's post-deposition declaration is a "sham affidavit," Dkt. 39, at 1–2; and Dins's violations of this court's summary judgment procedures.

**A.  Dins's post-deposition declaration is a sham affidavit**

DNR contends that Dins's post-deposition declaration, Dkt. 28, is a "sham affidavit." Dkt. 39, at 1–2. Dins moves for leave to file a sur-reply brief to address this issue, Dkt. 49, and the court will grant her motion.

The "sham-affidavit rule" generally prohibits parties from submitting affidavits that contradict prior deposition or other sworn testimony. *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). Courts may disregard affidavits that "add new factual details not previously disclosed in deposition testimony when those details seek to undo the effects of the prior testimony and manufacture a dispute to get past summary judgment." *Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 956 (7th Cir. 2024); *but cf. Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015) (holding that a post-deposition declaration did not contradict testimony when deponent was "not asked whether he had described *all* the inaccuracies with the written statement" and his declaration identified further inaccuracies).

Parties may submit affidavits that differ from their prior testimony only if they explain why an exception to the sham-affidavit rule applies. *See McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010). There are three exceptions: courts allow parties to submit affidavits that (1) contain newly discovered evidence, (2) show that a prior statement was

2

demonstrably mistaken due to confusion or a lapse in memory, or (3) clarify ambiguous or confusing testimony. *James*, 959 F.3d at 317.

DNR contends that Dins's post-deposition declaration is a sham affidavit because it introduces additional incidents involving Administrative Warden John Moore that did not come up at her deposition. *See* Dkt. 39, at 1; Dkt. 28, ¶¶ 9–10. During her deposition, Dins was asked to detail the times Moore harassed her. *See* Dkt. 15 (Dins Dep. 35:20–23). She recalled four such incidents:

> Q: [W]hat is the first incident that you can remember of Mr. Moore either discriminating [against] you or -- or harassing you?
>
> A: The first onboarding week, he was, what I felt, incredibly rude to the women, and I addressed that with him, and when I approached him getting coffee in the -- in the room in Madison, he stated that he had a wife and daughters and that he could speak to women the way that he wanted.
>
> . . .
>
> Q: [W]hat is [another] incident that you can remember of harassment and discrimination by Mr. Moore?
>
> A: Thank you. Repeated comments, especially in the -- like the mess hall area or the -- the cafeteria area in Fort McCoy specifically. There were multiple occasions where instructors would seat -- or sit -- be seated with other instructors, and I recall walking past and being told [by Moore] to go get him a cup of coffee and that a woman's place was in the kitchen.
>
> . . .
>
> Q: All right. So we've covered two incidents involving Mr. Moore. Can you remember a third incident with Mr. Moore?
>
> A: Yes.
>
> Q: All right. What's the third incident that you remember?
>
> A: We had been made to play dodgeball for PT or physical fitness. During dodgeball, I was struck by an elbow in the nose, and that -- it was crunched and I saw stars, and my nose bled. . . . [T]he

3

> next day in class, Mr. Moore jokingly addressed me taking a hit to the face and said you're all woman, hear me roar, until one hit to the face, in front of my recruit class.
>
> . . .
>
> Q: Okay. Do you remember any more comments that were directed at you?
>
> A: I believe in the form of disrespect. If I would ask a question or bring up something for clarification or -- or anything in a classroom setting, the response was different. I felt singled out multiple times, so I just got quieter and quieter.
>
> . . .
>
> Q: Do you recall any specific examples of this happening?
>
> A: Yes. We were -- our -- our academy was interfered with because of COVID, and at one point we were ordered that we couldn't leave[.] . . . On behalf of the class, I asked, what I perceived to be a very gentle, is there any update that could be given? And John Moore snapped back at me, nunya, nunya business, in front of every single member of our recruit class. And it wasn't just the words, it was the tone.

*Id.* at 35–47. She also recalled that Moore would "poke fun at [another female recruit] tipping over and her large chest being a problem to be a cop." *Id.* at 49:9–10. When asked whether she could recall any other specific incidents involving Moore, Dins said: "Not that I recall right now." *Id.* at 50:6.

In her declaration, Dins details additional specific incidents involving Moore. *See* Dkt. 28, ¶¶ 9–10. Dins recalls that, when Moore's daughter visited with her infant daughter, Moore "thrusted his daughter's baby to [Dins] to hold, at the same time saying something to the effect of, 'here woman, this is what you're good for.'" *Id.*, ¶ 9(f). She also recalled times that Moore directed comments at other recruits:

- Moore "publicly insult[ed] and degrade[d]" a female recruit "on a daily basis," including by attacking her body shape and her hair color, calling her a "dumb blonde." *Id.*, ¶ 10(a);

- Moore frequently said that this was "the strangest recruit class yet" while looking at the female recruits. *Id.*, ¶ 10(c);

- After a male recruit dropped out of the academy, Moore stated that he was "weak" while looking at the female recruits. *Id.*, ¶ 10(d);

- Moore used degrading language and made cynical comments "daily" and "most often directed towards the female recruits." *Id.*, ¶ 10.

Dins does not suitably explain why her declaration differs from her deposition testimony. *See McCann*, 622 F.3d at 751. She contends that her declaration does not conflict with her deposition testimony because it "highlights other aspects of her deposition testimony or supports her recollections which went unquestioned." Dkt. 49, Ex. 1, at 2. Her argument is unpersuasive. Dins was thoroughly examined about specific incidents of harassment by Moore, a topic which was exhausted when Dins could not recall any other incidents. *See* Dkt. 15 (Dins Dep. 50:1–6); *cf. Castro*, 786 F.3d at 571. Her declaration improperly identifies additional incidents that she did not disclose when given the opportunity. *See Clacks*, 108 F.4th at 956.

Dins also argues that it is "reasonable to understand" that her "recollections of additional harassment and discrimination experienced would be refreshed" as the case progresses. Dkt. 49, Ex. 1, at 2–3. But Dins needed to show that her prior statement was demonstrably mistaken because of a lapse in memory. *See James*, 959 F.3d at 317. She neither explains why her memory failed her during her thorough deposition nor identifies any event after her deposition that refreshed her memory.

5

Dins did not suitably explain why an exception to the sham-affidavit rule applies, so the court will credit her deposition testimony and disregard her declaration on these topics.

## B. Dins's violations of the summary judgment procedures

This court's summary judgment procedures require parties to admit or explicitly dispute a proposed fact by stating their version of it and citing evidence in support. Dkt. 8, Standard Attachments for Civil Cases Assigned to Judge Peterson (SJ Procedures), at 4. Dins's responses to DNR's proposed facts frequently violate this requirement. Here is an example:

> DNR's proposed fact: Augle followed up saying "And you're absolutely positive that you and [Weisensel] never laid in your bed at the Academy," to which Dins responded, "We did not."
>
> Dins's response: No dispute regarding Defendant's recitation of Augle's statements and Dins' contemporaneous responses made during Dins' investigatory interview with Augle. Responding further, Dins was confused by the wording of Augle's questioning and the "abrupt ... shift" in the conversation. While Dins would have "been a lot more able [sic] to answer with clarity," had Augle added more detail to help Dins "jog[] [her] memory," Dins answered to the best of her ability. Dins further responds that it appeared to her that Augle had information of an allegation that she was "lying in a bed" with Weisensel at Academy, but was unsure of any additional information or context to answer Augle's question.

Dkt. 41, ¶ 58 (cleaned up). Dins's response attempts to dispute everything except DNR's "recitation of Augle's statements and Dins' contemporaneous responses made during Dins' investigatory interview with Augle." *Id.* But her response neither disputes the substance of DNR's proposed fact nor offers evidence contradicting it. In accordance with this court's summary judgment procedures, the court deems the proposed fact to be undisputed and will

6

disregard the additional commentary. The court will take the same approach to Dins's other responses.[1]

This court's summary judgment procedures also prohibit parties from responding to proposed facts with additional facts that are not directly responsive or with arguments on the merits. SJ Procedures, at 5. Dins often flouts these prohibitions. Consider this response:

> DNR's proposed fact: Dins alleged John Moore had sexually harassed her during Academy, as well as other instructors and recruits, and Augle wanted to follow-up on those allegations in a separate interview. This was the first time Dins reported any concerns about Moore to Augle and the Bureau of Human Resources.
>
> Dins's response: No dispute. Dins additionally asserted that Moore, as well as other instructors and recruits, harassed/bullied her seemingly because she was a female recruit. Responding further, on June 8, 2020, Dins and Augle discussed Dins' allegations of sexual harassment at the end of Dins' first investigatory interview— after Augle informed Dins that she did not "have any additional questions for you." In response to Dins' report of sexual and/or sex-based harassment, Augle asked for examples and Dins replied that she would have to "go back to [her] journal" to "dig up some direct quotes." Further during the second investigatory interview on June 8, 2020, Augle did not inform Dins that Augle would be asking more questions related to Dins' personal/romantic relationship with Weisensel, until Augle told Dins that Augle had "a couple other questions to follow up on … Was [Weisensel] ever in your dorm room after 10:30, do you remember?" Dins disputes that Augle "wanted to follow-up on [her sexual/sex-based harassment] allegations in a separate interview" as it became apparent to Dins during the second investigatory interview that Augle was only interested in unnecessarily scrutinizing and harassing Dins regarding her same-sex relationship with her non-supervisory colleague, Weisensel.

---

[1] *See, e.g.*, Dkt. 41, ¶¶ 9, 33, 56, 68–69, 72–73, 75, 77–78, 85, 97.

Dkt. 41, ¶ 55 (cleaned up). Dins's response should have been: "No dispute." Everything following "No dispute" is improper and will be disregarded. The court will also disregard improper facts and arguments in Dins's other responses.[2]

With these preliminary issues out of the way, the court now turns to considering DNR's summary judgment motion.

UNDISPUTED FACTS

DNR hired Dins as a limited term conservation warden in October 2019. As a new employee, Dins was required to attend a training academy at Fort McCoy, Wisconsin, to learn her duties before she could be assigned to a field station.[3] The academy was overseen by Administrative Warden John Moore. Dins attended the academy alongside her fellow recruits and other DNR employees. One of these non-recruit employees was Jill Weisensel. Weisensel served as a Regional Conservation Warden for the Southeast Region, a role with supervisory duties and authority.

During the academy, Moore made sexist comments to Dins, such as telling her that "a woman's place was in the kitchen" and "to go get him a cup of coffee." Dkt. 41, ¶ 92. Moore also made sexist comments to another female recruit. Dins did not report Moore's comments to her supervisor or anyone at the Bureau of Human Resources at the time.

---

[2] *See, e.g.*, Dkt. 41, ¶¶ 33, 41, 54, 56, 58–59, 61–62, 72–73, 75, 77–78.

[3] The academy began in late October 2019. Dkt. 43, ¶ 3. It was disrupted by the COVID-19 pandemic and temporarily shut down in March 2020. *See id.*, ¶¶ 63–64. Dins and her recruit class returned to the academy in June 2020. *Id.*, ¶ 66. She graduated from the academy later that month. Dkt. 41, ¶ 67.

Andrea Augle oversaw DNR's grievance process and conducted investigations into workplace misconduct. In May 2020, Augle began investigating Dins's roommate's allegations that Dins was romantically involved with Weisensel.[4] Dins's roommate previously sent Augle photographs showing Dins and Weisensel lying in bed together at the academy.[5] Dins's roommate told Augle that she was repeatedly asked not to say anything about Dins's relationship with Weisensel and that Dins and Weisensel were "basically asking [her] to lie for them." *Id.*, ¶ 33.

On June 8, 2020, Augle met with Dins. Dins confirmed that she and Weisensel were in a relationship. Dins also reported Moore's harassment to Augle.

Dins and Augle met again later that night to discuss Moore's sexist comments. Augle also further questioned Dins about her relationship with Weisensel. Augle asked Dins whether she and Weisensel had lain in bed together at the academy. Dins stated that they sat on her bed. Augle asked: "And you're absolutely positive that you and [Weisensel] never laid in your bed at the Academy." *Id.*, ¶ 58. Dins responded: "We did not." *Id.*

Augle informed Dins of the picture of her and Weisensel lying in bed together. Dins then recalled "being really upset a couple nights and one night she needed Weisensel to hold her, with clothes on, with no sexual intimacy." *Id.*, ¶ 61.

---

[4] Dins disputes who reported the relationship but does not dispute that her roommate made the initial allegations. *See* Dkt. 41, ¶ 9.

[5] Dins disputes the "foundation of the allegation that the photos [her roommate] sent Augle during her investigatory interview were indeed of Dins and Weisensel and occurred on the dates [her roommate] stated the photos were taken." Dkt. 41, ¶ 31. But Dins later admits that the photos were taken "in the context of Dins and Weisensel napping," *id.*, so the court finds it undisputed that the photographs were of Dins and Weisensel.

Dins offered to resign, but Augle said that she had not made any determinations at the time. She told Dins that she would address Dins's harassment allegations.

Augle began investigating Moore's conduct. Moore was placed on administrative leave on June 16, 2020. He retired the same day.

On June 19, 2020, Augle and DNR leadership met to discuss Dins's conduct and determined that she had to be terminated because she lied to Augle during their meeting.[6] Dins was to receive a termination notice on June 22, 2020.

On June 20, 2020, Dins received a call ordering her from the field and telling her to turn in her gear. Dins was not told why, but she understood the call to mean that she was facing imminent termination. Dins resigned that same morning.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

DNR moves for summary judgment, Dkt. 17, so the court views all the facts and reasonable inferences in the light most favorable to Dins. *E.E.O.C. v. Vill. at Hamilton Pointe LLC*, 102 F.4th 387, 400 (7th Cir. 2024). The court will grant DNR's summary judgment

---

[6] DNR alleged that DNR leadership determined that Dins violated State of Wisconsin Work Rule 1 because she lied to Augle. *See* Dkt. 41, ¶ 73; *see also id.*, ¶ 74 ("Work Rule 1 addresses 'falsification of records, knowingly giving false information or knowingly permitting, encouraging or directing others to do so. Failing to provide truthful, accurate, and complete information required.'"). DNR also alleged that Dins's violation of Work Rule 1 "necessitated that her appointment with the DNR would be terminated." *Id.*, ¶ 78 (citing Dkt. 20, Ex. 4, at 6 ("Lying, cheating, or stealing will not be tolerated by DNR personnel. Anyone committing, or having knowledge of these acts without reporting them, will be immediately dismissed.")). Dins purports to dispute both these facts. *See id.*, ¶¶ 73, 78. But she offers no evidence contradicting them, and her responses constitute improper argument. The court deems the proposed facts to be undisputed.

motion only if the material facts are undisputed and DNR is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If there is evidence from which a reasonable jury could return a verdict in Dins's favor, there is a genuine dispute precluding summary judgment. *See Trahanas v. Nw. Univ.*, 64 F.4th 842, 852 (7th Cir. 2023). But the "mere existence of a scintilla of evidence" in support of Dins's position is not enough to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Dins must support her positions with admissible evidence; she cannot create a genuine dispute with "unsupported allegations." *Anderson v. Street*, 104 F.4th 646, 651 (7th Cir. 2024).

Title VII prohibits an employer from discriminating against an employee because of her sex. 42 U.S.C. § 2000e-2(a)(1). Discriminating against an employee on the basis of sexual orientation is also discrimination because of sex. *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 351–52 (7th Cir. 2017) (en banc); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 683 (2020).

Dins contends that DNR discriminated against her because of her sex. She raises four claims: hostile work environment, constructive discharge, discrimination, and retaliation. The court will consider each in turn.

A.  **Hostile work environment**

Dins contends that DNR violated Title VII by tolerating a hostile work environment involving sexual harassment. *Anderson*, 104 F.4th at 652; *see Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). In the Title VII context, sexual harassment includes conduct that is sexist or demonstrates "anti-female animus." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (citation omitted).

1. **Scope of claims**

Before considering the merits of Dins's hostile work environment claim, the court must address DNR's contention that parts of her claim are outside the scope of her Equal Employment Opportunity Commission charge. *See* Dkt. 22, at 18–19, 26. Dins's EEOC charge and her complaint "must, at minimum, describe the *same conduct* and implicate the *same individuals*." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994); *see also Babrocky v. Jewel Food Co.*, 773 F.2d 857, 863–64 (7th Cir. 1985). An EEOC charge and complaint implicate the same individuals when the charge uses a broad term (for example, "Village and police department leaders") and the complaint identifies a specific individual falling within that broad term (for example, the "Chief of Police"). *See Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013).

Dins's EEOC charge contained two allegations. *See* Dkt. 20, Ex. 8. She alleged that she was harassed by "a male training director" (Moore). *Id.* at 2; *see* Dkt. 1, ¶ 13. She also alleged that "Human Resources mainly questioned [her] personal relationship with a female employee," an allegation against Augle. Dkt. 20, Ex. 8, at 2; *see* Dkt. 1, ¶ 18; Dkt. 41, ¶ 38.

In this litigation, Dins tries to include harassment allegations against at least seven other individuals. *See* Dkt. 1, ¶ 13; Dkt. 43, ¶¶ 21–23, 29, 32, 35–38, 42. Dins's use of a general term ("Human Resources") in her EEOC charge permits her to bring allegations against Augle. *See Lavalais*, 734 F.3d at 634. But she may not rely on a specific term ("a male training director") to allege different conduct by different individuals. *Cheek*, 31 F.3d at 501. Dins's fairly noticed complaints concern only Moore and Augle.

### 2. The "severe or pervasive" element is dispositive

Title VII hostile work environment claims have four elements: (1) the work environment was objectively and subjectively offensive, (2) the harassment was based on sex, (3) the conduct was "so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment," and (4) there is a basis for employer liability. *Anderson*, 104 F.4th at 652 (citation omitted). The third element is dispositive.[7]

Not all inappropriate comments constitute sexual harassment. "[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018); *see Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002). Unless extremely serious, these types of remarks do "not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

In determining whether harassment was sufficiently severe or pervasive for a hostile work environment claim, courts look at the totality of the circumstances and consider several

---

[7] DNR also contends that there is no basis for employer liability. *See* Dkt. 22, at 29–31. Assuming Moore is a coworker and not a supervisor for liability purposes, DNR is liable if it was negligent in controlling working conditions. *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). It is undisputed that one of Dins's colleagues met with their supervisor in late March 2020 and told him that Moore "treat[ed] people like shit and berate[d] every female that walk[ed] through the door." Dkt. 43, ¶ 63. It is also undisputed that the supervisor asked no follow-up questions during that meeting. *See id.* Shortly after the meeting, the academy was shut down due to COVID. *See id.*, ¶ 64. It reopened about a week before Augle's meeting with Dins, where Dins told Augle about Moore's harassment. *See id.*, ¶ 66; Dkt. 41, ¶ 97. There is no evidence in the record regarding what the supervisor or DNR did after Dins's colleague reported Moore's harassment in March 2020. One reasonable inference from this lack of evidence is that DNR did nothing after receiving notice of Moore's harassment in March 2020. But the court need not determine whether DNR was negligent because, as will be discussed, Dins did not show that Moore's comments to her were severe or pervasive.

13

factors. *See Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). These factors include "the severity of the allegedly discriminatory conduct, its frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance." *Anderson*, 104 F.4th at 652 (citation omitted). The key question is whether the conduct was so severe or pervasive that it created an abusive working environment. *Scruggs*, 587 F.3d at 840. Summary judgment is proper when no reasonable jury could find that the conduct was severe or pervasive. *Cf. Johnson v. Advoc. Health and Hosp. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018).

Dins's harassment allegations relate to multiple incidents involving Moore and one incident involving Augle. The court starts with the incident involving Augle.

Dins says that Augle intensely questioned her about her relationship with Weisensel during Augle's investigation into that relationship. *See* Dkt. 43, ¶¶ 97, 107–08. Employers violate Title VII when their investigations are conducted contrary to protocol and in a harassing or humiliating manner. *See Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001–02 (7th Cir. 2000). But Dins offers no evidence that Augle strayed from her standard approach to investigating employee complaints. *See* Dkt. 41, ¶¶ 10–14, 38–50, 54–66.[8] Augle's conduct is not harassment.

---

[8] Dins purports to dispute two of DNR's proposed facts on this topic. *See* Dkt. 41, ¶¶ 13–14. She says that they "appear[] to assert Augle's general practice and procedures, for conducting fact-finding interviews within WI DNR, as opposed to Augle's specific practice and procedures for the internal investigation related to Dins conducted in or around the summer of 2020 regarding Augle's typical process for fact-finding interviews." *Id.* Dins offers no evidence contradicting DNR's proposed facts, and her responses constitute improper argument, so the court deems the proposed facts to be undisputed.

Dins contends that she was subjected to a hostile work environment based on the following incidents involving Moore:

- In October 2019, after Dins told Moore he was "incredibly rude to women," Moore responded that he "had a wife and daughters" and that "he could speak to women the way that he wanted." *Id.*, ¶ 91; *see* Dkt. 15 (Dins Dep. 19:17–18);

- Before Christmas 2019, Moore made "repeated comments" towards Dins as she walked by him in the cafeteria. For example, he told her that "a woman's place was in the kitchen" and "to go get him a cup of coffee." Dkt. 41, ¶ 92; *see* Dkt. 15 (Dins Dep. 39:17–19);

- In December 2019 or January 2020, Dins was struck in the face by an elbow during a dodgeball game and Moore "jokingly" told Dins "you're all woman hear me roa[r], until one hit to the face." Dkt. 41, ¶ 93; *see* Dkt. 15 (Dins Dep. 42:1–3);

- In March 2020, Moore was disrespectful towards Dins. For example, he "snapped back" at her after she asked him a question regarding COVID-19 protocols, saying "nunya business." Dkt. 41, ¶ 94; *see* Dkt. 15 (Dins Dep. 48:23);

- At some point, Moore also told another female recruit that she was "very 'large-chested' and would poke fun 'at her tipping over and her large chest being a problem to be a cop.'" Dkt. 41, ¶ 95.

In addition to what Dins personally recalls, one of her colleagues submitted a declaration detailing further incidents involving Moore. *See* Dkt. 30. Here is the problem with the colleague's evidence: "Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)."

15

*Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000). Dins offers no admissible evidence showing that she knew of these incidents, so they are irrelevant. *See id.*

In total, over the course of six months, Dins has admissible evidence of five incidents in which Moore made sexist comments to her or a female colleague. Moore's comments were offensive and do not belong in the workplace. But no reasonable jury could find that his conduct was so severe or pervasive as to create an abusive working environment. *Johnson*, 892 F.3d at 901.

In several cases, the Seventh Circuit has held that conduct more egregious than Moore's did not amount to severe or pervasive harassment. *See, e.g., Anderson*, 104 F.4th at 652 (holding that the conduct was not severe or pervasive even though a coworker inappropriately touched the plaintiff multiple times and the manager called her a "bitch"); *Scruggs*, 587 F.3d at 841 (same, even though a supervisor said the plaintiff was "made for the back seat of a car" and looked like a "dyke"); *Hilt-Dyson*, 282 F.3d at 463–64 (same, even though a supervisor rubbed the plaintiff's back on two occasions and stared at her chest during a uniform inspection). Finally, consider *Patt v. Family Health Systems, Inc.*, 280 F.3d 749 (7th Cir. 2002). In *Patt*, the plaintiff contended that she was subjected to a hostile work environment because her male department chief made eight gender-related comments, such as "the only valuable thing to a woman is that she has breasts and a vagina." *Patt*, 280 F.3d at 754. The Seventh Circuit held that the conduct was offensive but did not constitute severe or pervasive harassment. *Id.*

The same result follows in this case: Moore's comments, though rude and unprofessional, do not constitute severe or pervasive harassment. DNR is entitled to summary judgment on Dins's hostile work environment claim.

B. **Constructive discharge**

Dins also contends that DNR constructively discharged her. Dkt. 24, at 31–32. To establish a constructive discharge claim, Dins must show that she "was forced to resign because [her] working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). Put differently, Dins must show that her working conditions were objectively intolerable. *Myers v. Sunman-Dearborn Cmty. Schs.*, 142 F.4th 527, 535 (7th Cir. 2025). Working conditions are not objectively intolerable "merely because a 'prospect of discharge lurks in the background.'" *Chapin*, 621 F.3d at 679 (citation omitted); *see Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004) (rejecting the argument that an employer's "notice of intent to commence a process leading to discharge may be treated . . . as a completed discharge, even if the employer does not undermine the employee's position, perquisites, or dignity in the interim").

Dins offers no evidence that her working conditions had become objectively intolerable. Instead, the evidence shows that Dins's working conditions improved after she reported the sexual harassment to Augle because Moore retired days after Dins's report. Dkt. 41, ¶¶ 70, 97. Dins admits that she resigned because she believed she "was being pushed out," *id.*, ¶ 98, and she "fear[ed] imminent termination and a marred employment record that would preclude future employment," Dkt. 43, ¶ 113. But Dins's concerns about being terminated do not show that her working conditions had become unbearable. Her constructive discharge claim fails.

C. **Discrimination**

Dins contends that DNR discriminated against her because of her sex and sexual orientation. *See* Dkt. 24, at 22–30. Dins says that DNR took adverse employment actions

17

against her by ordering her from the field, telling her to turn in her gear, and later representing that she had "resigned in lieu of termination." Dkt. 43, ¶¶ 112, 116.

Dins's discrimination claim would survive summary judgment if a reasonable jury could find that her sex or sexual orientation caused the adverse employment actions. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Her claim turns on whether DNR's reason for taking the adverse employment actions was pretextual—"that is, an attempt to mask a discriminatory reason with a legitimate excuse." *Brooks v. Avancez*, 39 F.4th 424, 434 (7th Cir. 2022); *see Upchurch v. Indiana*, 146 F.4th 579, 587 (2025).

DNR contends that it took adverse employment actions against Dins because she lied to Augle. *See* Dkt. 39, at 11; Dkt. 41, ¶¶ 73–78. Dins has two arguments for why DNR's reason is pretextual. Dkt. 24, at 29–30. Both miss the mark.

First, Dins argues that "she was not 'out' as a member of the LGBTQ+ community," and so, was unsure how to respond to Augle's questions about her relationship with Weisensel. Dkt. 24, at 29. She says she "was caught off guard by Augle's questioning, and answered to the best of her ability under the circumstances." *Id.* at 30. It is understandable that someone who was not open about her sexuality would lie about her relationship with another woman. But Dins's explanation for why she lied does not call into question DNR's reason for taking adverse employment actions.

Second, Dins alleges that she was never informed of a DNR policy that prohibited her relationship with Weisensel. *Id.* (citing Dkt. 43, ¶¶ 78, 81, 98–99). Augle told Dins that a DNR fraternization policy applied to her relationship with Weisensel. Dkt. 43, ¶ 98. But Dins has never seen the policy. *See id.*, ¶¶ 78, 99. And neither party provided a copy of it for the record. Even without an explicit fraternization policy, it is reasonable for an employer to seek

18

additional information after receiving a report that an individual with supervisory authority is fraternizing with a subordinate.

Ultimately, Dins provides no evidence that DNR's stated reason for taking adverse employment actions against her was pretext for discrimination based on her sex and sexual orientation. As a result, no reasonable jury could find that DNR discriminated against her.

Dins resists this conclusion by invoking a few comparators. She points to a male coworker that complained about harassment; he was later reinstated after being terminated by DNR. Dkt. 24, at 22–24. But DNR did not terminate this coworker for lying, so he is not a fair comparator. Dins also points to two heterosexual relationships at DNR: one between a DNR supervisor and an individual in Human Resources; the other between two field wardens. *See id.* at 24, 30 (citing Dkt. 43, ¶¶ 89–91); Dkt. 30, ¶¶ 19, 21. But these individuals are not fair comparators because Dins does not show that they were supervisor-subordinate pairings like her and Weisensel. DNR is entitled to summary judgment on Dins's discrimination claim.

## D. Retaliation

Dins also contends that DNR retaliated against her because of her sex and sexual orientation. *See* Dkt. 24, at 33–34. Dins's retaliation claim would survive summary judgment if a reasonable jury could find that DNR took adverse employment actions against her because she submitted a harassment complaint. *See Upchurch*, 144 F.4th at 587. Like her discrimination claim, Dins's retaliation claim turns on whether DNR's reason for taking the adverse employment actions was pretextual. *See id.*

Dins provides no evidence that DNR took adverse employment actions against her because of her harassment complaint. As a result, no reasonable jury could find that DNR retaliated against her. DNR is entitled to summary judgment on Dins's retaliation claim.

ORDER

IT IS ORDERED that:

1. DNR's motion for summary judgment, Dkt. 17, is GRANTED.

2. Dins's motion for leave to file a sur-reply in opposition to DNR's motion for summary judgment, Dkt. 49, is GRANTED.

Entered September 26, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge